# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JENNA DEPUE,

Defendant.

CCA No. 12-10289

DC No. 2:10-cr-00109-RLH-PAL

District of Nevada, Las Vegas

**RESPONSE TO REMAND**
and
**O R D E R**

By Order filed December 12, 2012, on Appellant's unopposed motion to vacate this Court's order denying the imposition of a criminal forfeiture money judgment against Jenna Depue, the Ninth Circuit Court of Appeals remanded the appeal to me for further proceedings consistent with *United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011).

In *Newman*, the Circuit Court remanded the case to the Honorable James C. Mahan, to hold a hearing to determine the amount of the proceeds of the crime subject to criminal forfeiture in a case where the defendant Newman had stolen money, but had spent it.

This Court has studied the *Newman* case very carefully, together with the trial transcript of Jenna DePue's (hereafter "Jenna") testimony elicited by the United States in the two trials in which she testified for the United States against her brother, Brett DePue (hereafter "Brett"). Based on an examination of th evidence, the United States' unopposed motion is both misleading and disingenuous, in this Court's view. It neglects to present to the Circuit Court the actual facts of this case, noting only, and relying solely on, the "admissions" made in the plea agreement Jenna was compelled to accept and sign. Those admissions do not conform to the evidence the United States

itself elicited from her during trial of her brother, with whom she is accused of conspiring.

The facts, presented by the United States during trial, show that Jenna was not a conspirator of any crime, but was, in fact, a victim to the crimes of her brother, Brett, and others. The evidence does not support the claim that she received, to quote from *Newman*, any "proceeds of [her] criminal activity." *Newman,* at 1240, quoting *United States v. Casey*, 444 F.3d 1071, 1076 (9th Cir. 2006). The United States' evidence showed clearly that she had no *intent*, much less *specific intent,* to defraud, or even knowledge that she was committing a crime.

This case differs from *Newman* in that Newman pleaded guilty and there was no trial. While Jenna pleaded guilty in this case, she was originally named in the same indictment as her brother. This case was then filed separately, but she testified in her brother Brett's trial. In fact, she had to testify for the government twice, because Brett's first trial ended in a deadlocked jury. So, there is now no need for a further hearing here. The amounts claimed by the government are clear. The problem is the evidence shows her lack of involvement in the amounts claimed and the fact that she did not receive any proceeds from the real estate transactions identified by the United States.

Accordingly, while Newman was an active participant (or conspirator), Jenna was not. While Newman received proceeds, Jenna did not. While Newman intended to steal money, or defraud, Jenna did not. Jenna was a victim, intimidated, duped and unduly influenced by her brother, Brett. Now, the Department of Justice, not satisfied with making her a felon for life, wishes to make her a victim for the second time. Justice does not require forfeiture from Jenna. The relevant statutes were not designed to punish Jenna under the peculiar circumstances of this case.

Before proceeding further, it should be noted that the United States' Motion to Vacate was unopposed, presumably because Jenna (and her attorney) had entered into a plea agreement with the government waiving any right to appeal and any opposition could be argued by the government to be a violation of that contractual agreement, with even more dire consequences to Jenna. This Court is not so constrained. Inasmuch as Jenna's counsel does not feel free to argue the facts, circumstances and history of this case, this Court does so below.

BACKGROUND

Although named in the indictment against Brett DePue, the United States apparently quickly realized Jenna DePue's value as a witness. In fact, she was the most effective and critical witness against her brother, Brett, and, but for her testimony, his conviction would not have come so easily, if at all, nor would the pleas of other co-defendants been obtained so easily. She was the most credible witness who took the stand during two trials. She faced the most hostile and intimidating cross-examination from her brother of any other witness. Her brother represented himself, with standby counsel.

In anticipation of her testimony, she was broken out of the herd and indicted sepa- rately, with the anticipation that she would enter a plea and cooperate with the government in its case against her brother, Brett. The result of that procedural move meant that her case was before another judge, who took her plea with little or no knowledge of the facts of the overall case. The plea agreement recited facts in support of the plea, which were very general, such as using phrases like "she and others" did such and such, when in fact it was the others who were doing the acts, although she was there and aware of some of the things they were doing. The United States is basing its forfeiture claim against her on these "admissions" knowing that she was pretty much compelled to admit to them or face a trial and possible lengthy prison term. This for a person who has never been in trouble in her life, and who, for the nearly 50 people who wrote on her behalf (including family, friends, employers, co-workers, church leaders and members of her church where she in responsible for looking after the needs of others), is almost considered a saint.

Had she gone to trial in my court, and the evidence was presented that the government presented through her testimony, had I had any doubt about the jury's returning of a not guilty verdict, would have directed them to do so. But, alas, that did not occur, and I was faced with an accom- plished guilty plea and an "admission" of facts in a plea agreement prepared by the prosecutors.

In reaching its decision to deny an order of forfeiture, the foregoing was considered, together with the facts presented at trial, particularly the testimony of Jenna, as elicited by the

prosecutors themselves (the Court should note that the Assistant U.S. Attorneys prosecuting this appeal and the forfeiture are not those who prosecuted the cases.).  Those facts are presented below.

FACTS

The following is taken primarily from the testimony of Jenna, but is supplemented by immaterial, but helpful, geographical and other details presented at sentencing, which bring clarity to the testimony.  For example, Jenna testified about taking out $180,000 in equity from two homes owned by her and her sister, which they were induced by Brett to invest with him, but which was lost.  She did not explain that those houses were located in Arizona.  Sentencing documents clarified that fact.

Jenna was living in Gilbert, Arizona.  Her parents live in California, where she grew up.  She had a sister living in Arizona and a twin sister who is disabled and who lives with her parents.  She would spend her vacations visiting her parents to help care for her disabled twin sister.  Her parents, sister, and another brother were caught up in Brett's scheme as investors and victims, as well as Jenna.  Brett was a brother who, until this happened, the family looked up to.  He had been in the Air Force.  He purportedly had also performed with the Chippendales in Las Vegas.  He was charismatic, tall, good looking, and charming.

Brett called Jenna and told her that he was starting an investment business in Las Vegas and he really needed her to move to Las Vegas to be his office manager.  She had a good job in Arizona, together with a home, and she was reluctant to move, but he made her feel obligated to help out family and she finally relented, giving up her job and residence in the process.  She was paid $40,000 a year as a salary, from the company Brett established.  That is the only remuneration she received for her involvement.  According to the argument made by the government at sentencing, it is the forfeiture of this salary being sought.  She started in November 2005 and ended sometime in 2007, not working a full two years.

She acknowledged that her brother can be both persuasive and intimidating.  He persuaded her and her sister, Kendra, to take out the $180,000 of equity in the two homes they owned

in Arizona, promising that he would pay it back, and invest it in his investment ventures, ultimately in a proposed development in Mesquite, Nevada (75 miles east of Las Vegas), which never went anywhere, but which is not part of these charges.  They not only lost the $180,000, but eventually the homes, and Kendra had to file for bankruptcy as a result of Brett's promises and victimization of Jenna and Kendra.

   Jenna's work as office manager consisted initially of helping others identify properties, from MLS listings, which might be undervalued.  Otherwise, it consisted of those things office managers do: organizing files, paying bills as directed by Brett, keeping track of who was on the payroll, obtaining information about the homes in order to obtain renters, etc.   When they moved from working out of Brett's home, she was involved in getting the office building ready, getting computers, getting the office painted, and ready to move in.  She was not involved in overseeing people performing their jobs.  That was what Brett did. She would attend regularly scheduled office meetings, also.  She had to learn QuickBooks and how to enter information about the bank accounts. She would go to escrow offices a couple of times and pick up checks to be deposited into the bank account. She, however, did not have any control over the bank account.  Brett did.

   There came a time when Brett asked her to become a buyer/investor (what turned out to be a straw buyer) and to invite others to do so as well.  She finally, reluctantly agreed, and invited her sister Kendra to do so, also.  Brett also convinced his parents to do the same.  They lost their entire savings, like Jenna and Kenra, and nearly lost their home.  They, too, were victims of their son's scheme.

   Jenna, like the other straw buyers, was told that all Brett needed was her credit score (650-700) and her name, that houses would be purchased in her name, for which she would receive $5,000 per house, and then resold, with her getting a percentage of the profit.  Although several houses were purchased in her name, she never received any of the promised $5,000 per house.  Most of the houses were purchased, using her forged signature, and without her knowledge until her return from a three-to-four-month hiatus when she returned to Arizona for her health in the summer of 2006.

Brett told her that she needed to sign a loan application form, and that he would do the rest. He persuaded her to sign a blank form, and later, telling her that someone had written on that form, induced her to sign another. Later, when she was in Arizona, Brett said that he would send her other forms to sign. He also asked if he could just have someone sign her name on her behalf. She refused to authorize anyone to sign her name and she never received any documents to sign from Brett. However, upon her return (more about this in a moment) she discovered that several transactions bore her name and signature. But the rest of the document was not in her handwriting. Other transactions bore forgeries of her signature and name and none of the rest of the writing on those documents were in her handwriting and none of which she authorized.

She received no proceeds from the purchase or sale of these properties. She had nothing to do with the application or processing of documents for the purchase and resale, and resale again, of these properties. Of the two properties identified in the government's motion and in the plea agreement, for one, 3109 Whispering Canyon Court, her signature is forged and none of the handwriting on the documents relating to property is in her handwriting. And, she knew nothing of the transaction and did not participate in it. For the second, 878 Bare Branch Ave., she acknowledged that the signature was hers, and her printed name was in her hand, but the date was not. And, none of the other writing was in her handwriting, nor did she have any involvement in or knowledge of the preparation of the documents or the transaction. Nor did she receive any proceeds from any of the transactions. She never lied on loan applications or to get loans. She only became aware of their existence in her capacity as office manager, and then only after the fact.

It is true that just prior to her returning to Arizona, Brett told her to respond to some telephone calls that he anticipated would come in from a lender, to verify employment information for others (it is unclear whether there was one or more than one person for whom she verified the information, but it was only as to one company–Mauzzy Management Company) named in the loan applications for other properties. He told her to provide the information he gave to her, although she knew that the place of employment and the purported salary were not true. She felt it was wrong and

told Brett so. He told her that it was legal and that was the way everyone expected things to be done. So, she felt it was morally wrong, but did not know it was illegal. It was upon her brother's assurances that she did it. It was not because she had the intent to deceive or defraud anyone so she could get money or property. And so she testified in response to the prosecutor's questions to that effect.

In June 2006, she reminded Brett that she was not well and did not want to be in Las Vegas, and said she needed to return to Arizona for her health. He permitted her to go. She gave this testimony in response to a question by the prosecutor which asked if she had ever received any other benefit, other than her salary, for working there. She considered Brett's agreeing to her return to Arizona to be the only benefit she received, other than her salary. Throughout this time, Brett was living "high on the hog" as it were. He was throwing lavish parties, going to expensive spas, renting the most expensive suite at the JW Marriott hotel, and buying himself and others expensive clothes. This with money he should have used to make mortgage payments.

She remained in Arizona from June to September, at which time she told Brett that she did not want to return to Las Vegas, and that she did not feel comfortable working there. He intimidated her into returning by reminding her that he had permitted her to go on paid leave, that she was obligated to return to fulfill her employment obligations and of her obligation to him, her brother. He also threatened her that if she did not return, she would never see her $180,000 again, but that if she would, he would invest it in his Mesquite project. Whether he did or not is unknown. At any rate, she never saw it again. But she did return, reluctantly, testifying that she felt intimidated by her brother, It was apparently shortly thereafter that the housing market began to decline. The business closed in 2007; Brett's house was foreclosed on.

Brett, appealing to her duty to family, persuaded Jenna to permit him, his wife, and four children to move into her apartment in Arizona, where she had returned. He promised to find work and to pay for his family, and to only stay six months. He failed to find employment, and refused to do so, saying that if he earned money, creditors would just garnish his wages. He failed to provide assistance in paying rent, or to feed his family. He did not move out in six months. She

demanded he move out. He refused. Finally, when he started introducing alcohol into the residence, she moved out during the night, abandoning the apartment to him and his family, although she was still obligated to pay the rent until the lease expired several months later.

At the time of her sentencing, she had obtained a good job in Arizona as an Administrative Assistant at a structural engineering office (which knows of her circumstances), but was reduced to renting a bedroom in a private residence. Her credit is ruined. This is the felon the Department of Justice has created. She has spent five years in hell, but the DOJ is not satisfied. This Court submits justice has been.

LAW

1. Jenna's Faulty Plea of Guilty

Jenna pleaded guilty to Conspiracy to Commit Mail, Wire, and Bank Fraud, 18 U.S.C. §§ 1341, 1343, 1344, and 1349. A look at the elements of this crime and the foregoing facts show the United States did not have enough evidence to convict Jenna of this crime.

For example, Ninth Circuit Model Jury Instruction 8.20 provides that in order to convict someone of Conspiracy, the government must prove, *inter alia*, that Jenna became a member of an agreement to commit a crime, *knowing* at least one of the agreement's objects, and *intending* to help accomplish it. She must have known that the agreement was to do *something unlawful*. "It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another." The jury is also required to agree on the particular crime the conspirators agreed to commit. The Instruction continues: "One becomes a member of a conspiracy by *willfully* participating in the unlawful plan with the *intent* to advance or further some object or purpose of the conspiracy. . . ." "On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists." Further, Model Jury Instruction 8.23 requires the government to prove that Jenna had reason to believe that

whatever benefits she might get from the conspiracy were probably dependent upon the success of the entire venture.

All Jenna ever received, or had reason to believe she might receive, was her salary and, hopefully, the return of her $180,000. She did not know of any plan to commit an illegal act. She did not know of a plan, informal or otherwise.

The elements of Mail, Wire and Bank Fraud, are found in Model Instructions 8.121, 8.124, 8.127. Each requires, *inter alia*, that the government prove Jenna *knowingly* carried out or participated in a scheme or plan to obtain money from a bank and that she acted with the *intent to defraud*. The evidence the government, itself, produced proved that was not true.

Notwithstanding the fact that Jenna agreed to plead guilty and "admit" to the United States' statement of facts in support thereof, she was not guilty of this crime or any other. She was victimized by her brother. The government used her up and discarded her and now wants to punish her even further as a reward for her critical (and difficult) assistance to it in convicting her brother.

2. The Law of Forfeiture

Title 18 U.S.C. §982(a)(2) states, in pertinent part, "The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate—section . . . 1341, 1343, or 1344. . . shall order that the person forfeit to the United States *any property obtained* directly or indirectly, *as the result* of such violation. . . ." (emphasis added).

Title 28 U.S.C. §2461(c) states, in pertinent part, "If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture *of the property* as part of the sentence. . . ."(emphasis added).

The language of those two statutes might seem clear at first blush that forfeiture was required, or that Congress intended it to apply, in this case. The facts of this case, and the case law, suggest otherwise. This Court refers to citations and references in *United States v. Newman*, *supra*, confident of their accuracy.

/ / /

"The statue mandates that a defendant forfeit a very specific amount—the *proceeds* of [her] *criminal activity*." *Newman*, at 1240 and 1243, both times quoting *United States v. Casey*, 444 F.3d 1071, 1076 (9th Cir. 2006)(emphasis added). The facts show that Jenna committed no criminal activity, nor was it shown that she received proceeds from criminal activity.

"To be sure, the Supreme Court has recognized that there are constitutional limits to forfeiture. For example prosecutorial misconduct amounting to a due process violation limits the government's power to seek criminal forfeiture." *Newman*, at 1240. "[F]orfeiture orders are subject to the constitutional limit defined by the Excessive Fines Clause of the Eight Amendment" *Newman*, at 1241. This Court suggests that both are possible here.

"Congress conceived of forfeiture as *punishment* for the commission of various [crimes]." *Newman*, at 1241, quoting *Libretti v. United States*, 516 U.S. 29, 39 (1995)(emphasis added). The evidence produced by the United States shows that Jenna did not commit a crime. And surely the punishment she has already received for this crime she did not commit is sufficient.

"Requiring imposition of a money judgment on a defendant who currently possesses no assets furthers the remedial purposes of the forfeiture statute by ensuring that *all eligible criminal defendants* receive the mandatory forfeiture sanction Congress *intended* and *disgorge their ill-gotten gains*, even those already spent." *Newman*, at 1243, again quoting *Casey* at 1074 *(emphasis added).* First, Jenna is not an "eligible" criminal defendant given the facts of this case. Second, she received no "ill-gotten gains" to be disgorged.

"[T]he existence of a stipulated amount of forfeiture does not necessarily suffice. The Supreme Court has expressly recognized the potential for abuse in situations like these; 'We do not mean to suggest that a district court must simply accept a defendant's agreement to forfeit property, particularly when that agreement is not accompanied by a stipulation of facts supporting forfeiture, or *when the trial judge for other reasons finds the agreement problematic.*'" *Newman*, at 1245, quoting *Libretti v. United States*, 516 U.S. 29, 43 (1995). (emphasis added).

/ / /

"The district court then shall enter an order of criminal forfeiture in the amount of the 'proceeds' of [Jenna's] crime." *Newman*, at 1245-6.

There was no crime by Jenna and there were certainly no "proceeds" of any such crime received by Jenna.

The statutes were written to address those who commit crimes and as a result obtain "proceeds" from that crime. It is only reasonable that Congress intended the same result. Neither the statutes, nor Congress, anticipated that a Jenna Depue, intimidated and cajoled into helping her brother by working in his office as an office manager, and who was not involved in making any false or fraudulent statements to lenders, nor aware that what she was doing was illegal, who was, herself, a victim, and who performed a herculean effort to cooperate with the government by being the most critical, credible, and important witness, in two trials, facing the hostile and intimidating examination by her brother, and who received no proceeds from her activities, and who was only paid a meager salary, to have to, after all that, forfeit that salary as a reward for her cooperation.

It appears that the United States Attorney's Office has lost sight of the self-imposed mandate that its first priority is not winning cases, but to do justice. Other actual co-conspirators, who cooperated, but whose testimony was not used in the second trial because they made such terrible witnesses in the first trial, were treated better by the government than Jenna has been. Their actions toward their star witness in this case is the most egregious miscarriage of justice I have experienced in more than twenty years on the bench. I refuse to be a party to it.

ACCORDINGLY, finding it consistent with *United States v. Newman*, 695 F.3d 1235 (9th Cir. 2001), IT IS HEREBY ORDERED that this Court's order denying the imposition of a criminal forfeiture money judgment against Jenna DePue is REINSTATED.

Dated: January 10, 2013.

**Roger L. Hunt**
**United States District Judge**